**IN THE UNITED STATES COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

PRAIRIE PROTECTION COLORADO, a Colorado non-profit corporation,

     Plaintiff,

v.

USDA APHIS WILDLIFE SERVICES, a federal agency; and
JANET L. BUCKNALL, Deputy Administrator, USDA APHIS Wildlife Services;

     Defendants.

_____

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**
_____

**I.     INTRODUCTION**

1.     Plaintiff Prairie Protection Colorado ("Prairie Protection"), by and through its undersigned counsel, brings this lawsuit against Defendants U.S. Department of Agriculture Animal and Plant Health Inspection Service Wildlife Services ("Wildlife Services") and Janet L. Bucknall ("Deputy Administrator" and, together with Wildlife Services, "Defendants").

2.     On or about August 19, 2019, Wildlife Services entered into a Cooperative Service Agreement with the City of Commerce City ("Commerce City") (the "Urban Rodent Control Agreement") under which Wildlife Services is to kill an urban colony of prairie dogs located in Commerce City.  In so doing, Wildlife Services is failing to comply with the Animal Damage Control Act, 7 U.S.C. § 8353; its policy interpreting that statute, 78 Fed. Reg. 49445 (Aug. 14, 2013), and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.  More specifically, despite the fact that the Animal Damage Control Act prevents Wildlife Services

from conducting "urban rodent control," Wildlife Services entered into the Urban Rodent Control Agreement to do just that.

3.      Through this Complaint for Declaratory and Injunctive Relief (the "Complaint"), Plaintiff seeks a declaration that Wildlife Services' authorization and implementation of the Urban Rodent Control Agreement violates federal law and is otherwise arbitrary and capricious. Prairie Protection additionally seeks injunctive relief to redress the injuries these violations cause.  Should Prairie Protection prevail, it will seek an award of costs, attorneys' fees, and other expenses pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412.

## II.      PARTIES

4.      Plaintiff Prairie Protection is a Colorado non-profit corporation with its principal place of business located in Colorado.

5.      Defendant Wildlife Services is a division of the United States Department of Agriculture ("USDA") Animal and Plant Health Inspection Service ("APHIS").   Wildlife Services is a federal agency responsible for applying and implementing the federal laws and policies challenged in this complaint.  Wildlife Services receives federal and cooperator funding to undertake its activities in Colorado, including under the Urban Rodent Control Agreement.

6.      Defendant Deputy Administrator is being sued in her official capacity as the Deputy Administrator of USDA APHIS Wildlife Services.

7.      Commerce City, a third party, is a Colorado municipal corporation organized and existing as a home rule city under Article XX of the Colorado Constitution.

8.      Prairie Protection, as well as its board members, staff, and supporters, advocates for prairie dogs and for the conservation and restoration of prairie ecosystems throughout

Colorado.  Grasslands are the most endangered ecosystem on the planet.  Prairie dogs are a keystone species of the grasslands, and support upwards of 180 other species.  The current prairie dog population is at less than 2% of their historical numbers.  The decline in black footed ferrets, the most critically endangered mammal in the United States, and burrowing owls, a threatened species in Colorado, is directly correlated to this decline in prairie dog population.  Prairie Protection's mission is to protect prairie dogs to support thriving, contiguous, natural prairies across Colorado sufficient to allow the reintroduction and survival of charismatic species such as black footed ferrets and burrowing owls.

9.      Prairie Protection board members, staff, and supporters regularly recreate throughout Colorado, including in areas populated by prairie dogs.  Prairie Protection's board members, staff, and supporters enjoy watching and studying prairie dogs and the wildlife that depends on them.  These animals include black footed ferrets, burrowing owls, foxes, bobcats, coyotes, reptiles, and birds of prey.  Many birds such as mountain plovers and burrowing owls rely on prairie dog colonies for breeding, making prairie dogs an important factor in enjoying many birds in Colorado for years to come.  Their migratory nature means that these birds can be found moving throughout Colorado at different times of the year.  Whether prairie dogs are found in urban settings or in more rural locations, their burrows and colonies provide food and support for entire ecosystems, and provide aesthetic, biological, and recreational resources for Prairie Protection's board members, staff, and supporters.

10.      Prairie Protection's board members, staff, and supporters live and recreate in or near areas within the area where implementation of the Urban Rodent Control Agreement will occur, for the purposes of hiking, observing wildlife, and other recreational and professional

pursuits.  Prairie Protection's board members, staff, and supporters enjoy observing, attempting

to observe, photographing, and studying wildlife, including signs of the above-mentioned

species' presence in these areas.  The opportunity to possibly view wildlife or signs of wildlife in

these areas is of significant interest and value to Prairie Protection's board members, staff, and

supporters and increases the use and enjoyment of public lands and ecosystems in Colorado.

Prairie Protection's board members, staff, and supporters also have an interest in the health and

humane treatment of animals, and work to rehabilitate injured wildlife, including wildlife that

may have be harmed by implementation of the Urban Rodent Control Agreement.   Prairie

Protection's board members, staff, and supporters have engaged in these activities in the past and

intend to do so again soon.

11.     Prairie Protection, as well as its board members, staff, and supporters, are

committed to ensuring that Wildlife Services complies with all applicable federal laws.  Wildlife

Services authorization and implementation of the Urban Rodent Control Agreement adversely

impacts Plaintiff's interests in the Colorado wildlife that Wildlife Services could injure or kill—

intentionally or unintentionally—including prairie dogs, black footed ferrets, burrowing owls,

and others.  Prairie Protection also has board members, staff, and supporters who are adversely

impacted by the threat that Wildlife Services poses to companion animals in Colorado.

12.     Prairie Protection and it's board members, staff, and supporters have a procedural

interest in ensuring that Wildlife Services complies with all applicable federal statutes and

regulations.  Prairie Protection has worked to reform Wildlife Services.  Prairie Protection and

it's board members, staff, and supporters have an interest in preventing Wildlife Services from

using lethal and inhumane methods of wildlife damage management, and in the use of more

4

effective and proactive non-lethal alternatives that foster communities' coexistence with wildlife. The relief requested in this litigation would further that goal.

13.     The interests of Prairie Protection and it's board members, staff, and supporters have been, and will continue to be, injured by Wildlife Services' implementation of the Urban Rodent Control Agreement and by Wildlife Services' failure to comply with federal law as well as its own policies.

14.     The relief Prairie Protection seeks in this Complaint would redress the injuries of Prairie Protection and it's board members, staff, and supporters.  The relief Prairie Protection requests, if granted, would prevent Wildlife Services from engaging in wildlife killing under the Urban Rodent Control Agreement.  Prairie Protection's requested relief, if granted, could have a long-term impact on reducing the amount of wildlife killing conducted in Colorado, as well as the inhumane treatment of wildlife and other injuries.  Prairie Protection's requested relief, if granted, would make wildlife killing more expensive for Commerce City and other local municipalities because these entities would not be able to contract with Wildlife Services to kill wildlife on their behalf unless and until Wildlife Services complies with federal law.  These entities would not be able to procure the services that the Urban Rodent Control Agreement authorized at the same cost as Wildlife Services.

15.     Prairie Protection's interests, and the interests of its board members, staff, and supporters, have been, are being, and will continue to be harmed by Wildlife Service's actions and inactions challenged in this Complaint unless the Court grants the requested relief.  The harm to Prairie Protection's interests, and to its board members, staff, and supporters' interests, will be redressed if this Court issues the requested relief.

### III.   JURISDICTION AND VENUE

16.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction).   The Court has authority to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201-2202 and 5 U.S.C. § 706(2).

17.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because a substantial part of the agency's violations of law occurred and continue to occur in this district, and injury to Plaintiff and its board members, staff, and supporters occurred and continues to occur in this district.   Moreover, Plaintiff resides in this district.

### GENERAL ALLEGATIONS

18.     Wildlife Services and its precursors have specialized in killing wildlife for more than 100 years and are responsible for the killing of wildlife like wolves, bears, and other animals from much of the United States, particularly in the West.   Wildlife Services contracts with other federal agencies, state and local governments and agencies, and private landowners to fulfill its mission of "managing problems caused by wildlife."

19.     At present, Wildlife Services kills more than one million native animals every year in the U.S.   In fiscal year 2018, Wildlife Services reported that it intentionally killed 357 gray wolves, 68,186 adult coyotes (plus an unknown number of coyote pups in 361 destroyed dens), 515,915 red-winged blackbirds, 338 black bears, 375 mountain lions, 1,002 bobcats, 173 river otters (plus 537 killed "unintentionally"), 3,343 foxes (plus an unknown number of fox pups in 125 dens), and 22,521 beavers.   The program also killed 17,739 prairie dogs outright, as well as an unknown number killed in more than 47,547 burrows that were destroyed or fumigated.

20.     Each year Wildlife Services unintentionally kills thousands of non-target animals. These non-target animals include federally- or state-protected wildlife such as gray wolves, California condors, lynx, bobcats, and grizzly bears, as well as eagles, falcons, red-tailed hawks, great horned owls, porcupines, marmots, great blue herons, ruddy ducks, sandhill cranes, and ringtail cats.   These killings undermine efforts to conserve and recover the affected species, which often need protection in part due to Wildlife Services' historic and ongoing practices.

21.     Former employees of Wildlife Services have alleged that the agency underreports the numbers of animals it kills and, therefore, that the actual numbers of animals killed by Wildlife Services are likely greater than reported.

22.     As explained below, many of the species that Wildlife Services targets play critical roles in ecosystems and their removals result in a cascade of unintended consequences. For example, declines in prairie dogs result in the loss of their trophic and ecosystem engineering effects on the prairie, with consequent declines in predators (including black-footed ferrets, foxes, badgers, bobcats, coyotes, and raptors), megaherbivore activity (including bison), invertebrate pollinators, and species that associate with the open habitats and burrows that they create (including burrowing owls, mountain plovers, pronghorn, cottontail rabbits, rodents, and many species of herpetofauna and invertebrates).   In short, the removal of so many animals from the environment significantly alters native ecosystem directly, indirectly, and cumulatively.

23.     Many of the methods Wildlife Services uses—including snares, leg-hold and body-gripping traps, and gas cartridges—are fundamentally nonselective, environmentally destructive, inherently inhumane, and often ineffective.

24.     For example, leg-hold traps are internationally recognized as inhumane and have been banned in many countries.  Upon being trapped, animals frantically struggle to free themselves both by attempting to pull their trapped limb out of the device and by chewing at the trap itself or even their own limb.  The force of the jaws clamping on the animal's limb and the subsequent struggle can result in severe trauma, including mangling of the limb, fractures, damage to muscles and tendons, lacerations, injury to the face and mouth, broken teeth, loss of circulation, frostbite, and amputation.  Wildlife Services often fails to routinely check its traps, and as such, many animals experience prolonged suffering and eventually die of exposure.

25.     A prairie dog is a rodent that is a type of ground squirrel.

26.     Commerce City is an urban area.

27.     An urban colony of prairie dogs lives in the Commerce City on open space near Second Creek.

28.     Burrowing owls have been present at the burrows located at the Second Creek prairie dog colony by Prairie Protection's supporters for at least the past fourteen years, including burrowing owls that this year nested and raised their fledglings there.

29.     The Second Creek prairie dog colony is located adjacent to the Rocky Mountain Arsenal National Wildlife Refuge, where the U.S. Fish and Wildlife Service are reintroducing the black footed ferret—the most endangered mammal in North America.  Due to this close proximity and their need for space, black footed ferrets may have moved from the Rocky Mountain Arsenal National Wildlife Refuge to the Second Creek prairie dog colony.

30.     In or around April 2019, Commerce City considered how to manage the Second Creek prairie dog colony, including considering having Wildlife Services kill the prairie dogs living there.

31.     At its May 20, 2019 meeting, Commerce City's city council put on hold the open space management plan to include the wildlife management plan until the city council got a better idea on what actions to take going forward.  This action was taken in response to citizen concerns about prairie dogs in the open space areas including the Second Creek prairie dog colony.

32.     On August 19, 2019, Commerce City decided to have Wildlife Services kill the colony of prairie dogs, and approved entering into the Urban Rodent Control Agreement.

33.     Commerce City and Wildlife Services have either executed the Urban Rodent Control Agreement, or are planning to imminently do so.

34.     Under the Urban Rodent Control Agreement, Commerce City has agreed to pay an estimated fee of $23,300.00 in exchange for Wildlife Services killing prairie dogs in Commerce City, including the Second Creek prairie dog colony.

35.     Due to the Urban Rodent Control Agreement and imminent poisoning of the Second Creek prairie dog colony, the U.S. Fish and Wildlife Service is currently taking steps to attempt to avoid any harm to black footed ferrets that may be located there.

## FIRST CLAIM FOR RELIEF
### (*Ultra Vires* –APA)

36.     Plaintiff Prairie Protection hereby incorporates the allegations set forth above as if fully set forth herein.

37.     The authorization and implementation of the Urban Rodent Control Agreement is *ultra vires* and beyond the authority delegated by Congress.

38.     Under the authority delegated by Congress, "[t]he Secretary of Agriculture is authorized, except for urban rodent control, to conduct activities and to enter into agreements with States, local jurisdictions, individuals, and public and private agencies, organizations, and institutions in the control of nuisance mammals and birds and those mammal and bird species that are reservoirs for zoonotic diseases."  7 U.S.C. § 8353.

39.     Wildlife Services lacks the authority to act unless and until Congress confers the power upon it to do so, and the Animal Damage Control Act explicitly precludes Wildlife Services from conducting urban rodent control.

40.     Wildlife Services has defined the term "urban" in the phrase "urban rodent control" to mean "a city or town with a population greater than 50,000 inhabitants, as well as the urbanized area contiguous and adjacent to such a city or town."  78 Fed. Reg. 49445, 49446. Commerce City meets this definition in two respects:  (i) its population as of July 1, 2018 is 58,449 according to the U.S. Census Bureau, and (ii) it shares a border with Denver's more than 50,000 inhabitants.

41.     Wildlife Services authorization and implementation of the Urban Rodent Control Agreement – including the proposed killing of urban prairie dogs within Commerce City – exceeds the limited power that Congress conferred upon Wildlife Services in the Animal Damage Control Act as amended, and is, therefore, *ultra vires*.

42.    Pursuant to the APA, the Court must reverse and set aside agency action that, as here, is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

## SECOND CLAIM FOR RELIEF
### (Arbitrary and Capricious – APA)

43.    Plaintiff Prairie Protection hereby incorporates the allegations set forth above as if fully set forth herein.

44.    Under the APA, courts "shall hold unlawful and set aside" agency action, findings, or conclusions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A).

45.    Wildlife Services' authorization of the Urban Rodent Control Agreement, along with any attempt at implementing it, is arbitrary, capricious, an abuse of discretion, and not in accordance with law under Section 706 of the APA, which has caused or threatens serious prejudice and injury to Prairie Protection's rights and interests. 5 U.S.C. § 706.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Prairie Protection Colorado prays that the Court enter judgment in its favor and against Defendants on the claim asserted herein, and that it be awarded the following relief:

(1)    Declare that Wildlife Services has violated and is violating the Animal Damage Control Act, 7 U.S.C. § 8353, and its policy interpreting that statute, 78 Fed. Reg. 49445, by authorizing and implementing the Urban Rodent Control Agreement;

(2)    Declare that Wildlife Services' authorization and implementation of the Urban Rodent Control Agreement is arbitrary, capricious, an abuse of discretion, and not in accordance

with law under the APA;

(3)     Declare that Wildlife Services' authorization and implementation of the Urban Rodent

Control Agreement is *ultra vires* under the APA;

(4)     Enter such temporary, preliminary and/or permanent injunctive relief as Plaintiffs may

hereinafter request, including enjoining Wildlife Services and its agents from proceeding

with implementing the Urban Rodent Control Agreement;

(5)     Award Plaintiff its attorneys' fees and costs in this action pursuant to the Equal Access to

Justice Act, 28 U.S.C. § 2412, and all other applicable authorities; and

(6)     Grant such other and further relief as the Court deems just and proper.

Respectfully submitted this 6th day of September, 2019.

THE ASKMAN LAW FIRM LLC

*s/ Michael M. Frandina*
Michael M. Frandina
1543 Champa St., Ste. 400
Denver, CO  80202
720-407-4331
michael@askmanlaw.com

*ATTORNEYS FOR PLAINTIFF*
*PRAIRIE PROTECTION COLORADO*