IN THE UNITED STATES COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:19-cv-02537

PRAIRIE PROTECTION COLORADO, a Colorado non-profit corporation,

    Plaintiff,

v.

USDA APHIS WILDLIFE SERVICES, a federal agency; and
JANET L. BUCKNALL, Deputy Administrator, USDA APHIS Wildlife Services;

    Defendants.

---

**PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION AND REQUEST FOR EXPEDITED HEARING**

---

Plaintiff Prairie Protection Colorado ("Prairie Protection"), by and through its undersigned counsel, and pursuant to Fed. R. Civ. P. 65, hereby submits this Motion for Temporary Restraining Order and Preliminary Injunction and Request for Expedited Hearing (the "Motion").

## I. INTRODUCTION

This action concerns a Cooperative Service Agreement that Defendant U.S. Department of Agriculture Animal and Plant Health Inspection Service Wildlife Services ("Wildlife Services") entered into with the City of Commerce City (the "Urban Rodent Control Agreement") that provides for Wildlife Services to kill prairie dogs located in Commerce City in exchange for a fee paid by Commerce City. In so doing, Wildlife Services is violating the express language of the Animal Damage Control Act ("ADCA"), as amended, 7 U.S.C. §§ 8351-8354, its own policy interpreting the phrase "urban rodent control", 78 Fed. Reg. 49445

(Aug. 14, 2013), and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.  More specifically, despite the fact that the ADCA specifically provides that Wildlife Services does not have authority to conduct "urban rodent control," Wildlife Services entered into the Urban Rodent Control Agreement to do just that.  Accordingly, Prairie Protection is asking this Court to preserve the status quo until trial by stopping Wildlife Services from implementing the Urban Rodent Control Agreement and killing the prairie dogs.

## II.     FACTUAL BACKGROUND

1. A prairie dog is a rodent within the squirrel family.  *See, e.g.*, ITIS Standard Report Page:  Cynomys ludovicianus, at p. 1 (stating rodent as the order and squirrel as the family for black tailed prairie dogs) (*available at* https://www.itis.gov/ servlet/SingleRpt/SingleRpt?search_topic= TSN& search_ value=180186#null) (last visited Sep. 4, 2019); *see also* 69 Fed. Reg. 51217 ("Prairie dogs occur only in North America.  They are rodents within the squirrel family…").

2. Commerce City is an urban area with a population of 58,449 as of July 1, 2018. *See* Declaration of Deanna Meyer dated September 6, 2019 ("Meyer Declaration") attached hereto as Exhibit 1, at ¶13.

3. An urban colony of prairie dogs lives in Commerce City on open space near Second Creek (the "Second Creek Prairie Dog Colony").  *See* Meyer Declaration, at ¶¶3-4.

4. On or around August 9, 2019, Smith Environmental and Engineering submitted to Commerce City a Second Creek Restoration Ecological Resources Report ("Smith Report").  A copy of the Smith Report is attached to the Meyer Declaration as Exhibit 1-D.

5. A picture of the area where the Second Creek Prairie Dog Colony can be found on

page 2 of that report. In addition, a picture of that same area from Google Maps is attached to the Meyer Declaration as Exhibit 1-E.

6. The Smith Report was prepared because in or around April 2019 Commerce City was considering how to manage the Second Creek Prairie Dog Colony. One option that Commerce City was considering during that time was to have Wildlife Services kill them. *See* Meyer Declaration, at ¶4; *see also* Ex. 1-C, Urban Rodent Control Agreement, at Art. 13 ("This Agreement shall become effective April 25, 2019 …").

7. At its May 20, 2019 meeting, Commerce City's city council put on hold the open space management plan to include the wildlife management plan until the city council got a better idea on what actions to take going forward. This action was taken in response to citizen concerns about prairie dogs in the open space areas including the Second Creek Prairie Dog Colony. *See* Meyer Declaration, at ¶4.

8. In August 2019, Commerce City decided to have Wildlife Services kill the Second Creek Prairie Dog Colony, and approved entering into the Urban Rodent Control Agreement with Wildlife Services. *See* Meyer Declaration, at ¶5. A copy of the Resolution approving execution of the Urban Rodent Control Agreement is attached to the Meyer Declaration as Exhibit 1-B and a copy of the Urban Rodent Control Agreement that was approved by Commerce City is attached to the Meyer Declaration as Exhibit 1-C.

9. Commerce City and Wildlife Services have either executed the Urban Rodent Control Agreement, or are planning to imminently do so. *See* Meyer Declaration, at ¶10.

10. Under the Urban Rodent Control Agreement, Commerce City has agreed to pay an estimated fee of $23,300.00 in exchange for Wildlife Services killing the Second Creek

Prairie Dog Colony.  *See* Ex. 1-C, at pp. 5-6.

11.    Commerce City has said that Wildlife Services may begin implementing the Urban Rodent Control Agreement as early as September 15, 2019.  *See* Meyer Declaration, at ¶10.

12.    The Second Creek Prairie Dog Colony is located adjacent to the Rocky Mountain Arsenal National Wildlife Refuge, where the U.S. Fish and Wildlife Service are reintroducing the black footed ferret—the most critically endangered mammal in North America.  Due to this close proximity and their need for space, black footed ferrets may have moved from the Rocky Mountain Arsenal National Wildlife Refuge to the Second Creek Prairie Dog Colony.  Due to the Urban Rodent Control Agreement and imminent poisoning of the Second Creek Prairie Dog Colony, the U.S. Fish and Wildlife Service is currently taking steps to attempt to avoid any harm to black footed ferrets that may be located there.  *See* Meyer Declaration, at ¶¶10-11.

13.    In addition, burrowing owls have been seen at the Second Creek Prairie Dog Colony every year for the past fourteen years, including sightings this year of burrowing owls nesting and raising their fledglings there.  The burrowing owls that were sighted at the Second Creek Prairie Dog Colony may still be present.  Burrowing owls are dependent upon prairie dogs because they use their burrows for nesting and roosting.  Due to the mass killing of prairie dogs that has occurred in the grasslands of the United States, burrowing owls are a threatened species in Colorado.  In order to protect burrowing owls, prior to any killing of prairie dogs the Colorado Division of Wildlife has a policy that a burrowing owl survey be conducted, which would take a minimum of two weeks since the three surveys are to be conducted at least a week apart.  *See* Meyer Declaration, at ¶12.

## III. ARGUMENT

Prairie Protection is entitled to a temporary restraining order ("TRO") and a preliminary injunction ("PI") until trial to stop Wildlife Services from killing the prairie dogs under the Urban Rodent Control Agreement. The primary goal of preliminary injunctive relief is to preserve the pre-trial status quo. *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009). "A request for a temporary restraining order under Fed. R. Civ. P. 65(b) is examined under the same standards applicable to a request for preliminary injunction under Rule 65(a)." *Watts v. Karmichael Family, LLC*, Civil Action No. 07-cv-00638-MSK-MJW, 2007 U.S. Dist. LEXIS 25192, at *2 (D. Colo. Apr. 4, 2007) (citing *Duvall v. Keating*, 162 F.3d 1058, 1062 (10th Cir. 1998)). The following standard applies to the requested TRO and PI:

> In order to receive a preliminary injunction, the plaintiff must establish the following factors: (1) a substantial likelihood of prevailing on the merits; (2) irreparable harm unless the injunction is issued; (3) that the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party; and (4) that the injunction, if issued, will not adversely affect the public interest. Because a preliminary injunction is an extraordinary remedy, the movant's right to relief must be clear and unequivocal.

*Dine Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1281 (10th Cir. 2016) (citations and quotations omitted). Each element favors Prairie Protection.

### A. Prairie Protection has a substantial likelihood of success on the merits

    1. <u>Wildlife Services killing these prairie dogs would violate the law since the Animal Damage Control Act explicitly precludes "urban rodent control"</u>

Prairie Protection has a substantial likelihood of success on its claims. Wildlife Services may only act within the bounds of statutory authority, here the Animal Damage Control Act (ADCA), as amended, 7 U.S.C. §§ 8351-8354. The ADCA states:

> The Secretary of Agriculture is authorized, **except for urban rodent control**, to conduct activities and to enter into agreements with States, local jurisdictions, individuals, and public and private agencies, organizations, and institutions in the control of nuisance mammals and birds and those mammal and bird species that are reservoirs for zoonotic diseases, and to deposit any money collected under any such agreement into the appropriation accounts that incur the costs to be available immediately and to remain available until expended for Animal Damage Control activities.

7 U.S.C. § 8353 (emphasis added).[1]  Not only does the ADCA not allow Wildlife Services to conduct urban rodent control, it expressly states that Wildlife Services does not have authority to do so.

There can be no question that killing these prairie dogs constitutes "urban rodent control". First, a prairie dog is a rodent. Second, the area within Commerce City where these prairie dogs are located is an urban area. The urban nature of the area, including the housing development surrounding the area, can be seen from the picture included in the Smith Report and the Google Maps picture. Moreover, Wildlife Services has stated that the term "urban" in the phrase "urban rodent control" means "a city or town with a population greater than 50,000 inhabitants, as well as the urbanized area contiguous and adjacent to such a city or town." 78 Fed. Reg. 49445, 49446. Commerce City meets satisfies Wildlife definition in two respects: (i) Commerce City is a city or town with a population greater than 50,000 inhabitants, and (ii) Commerce City is an urbanized area contiguous and adjacent to Denver.

### 2. The APA prevents Wildlife Services from killing these prairie dogs in violation of the Animal Damage Control Act

Prairie Protection's first claim under the APA is that by executing the Urban Rodent Control Agreement and taking steps to implement it, Wildlife Services is acting *ultra vires* in

---

[1] This same source of authority is cited in Article II of the Urban Rodent Control Agreement. *See* Ex. 1-C.

violation of the ADCA. The APA provides that a reviewing court "shall hold unlawful and set aside agency action . . . found to be . . . in excess of statutory jurisdiction, authority or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). This claim has a substantial likelihood of success on the merits because the ADCA explicitly states that Wildlife Services does not have authority to kill prairie dogs in an urban area like Commerce City.

Prairie Protection has asserted as its second claim under the APA that the action(s), finding(s), and/or conclusion(s) by Wildlife Services with respect to the Urban Rodent Control Agreement (including its execution and implementation) should be held unlawful and set aside by this Court as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). This claim also has a substantial likelihood of success on the merits because the ADCA explicitly states that Wildlife Services Wildlife Services does not have authority to conduct urban rodent control, so any steps taken by Wildlife Services towards killing these prairie dogs should be stopped.

### B. There is a danger of real, immediate, and irreparable injury

There is a danger of real, immediate, and irreparable injury unless a TRO and a PI are granted. More specifically, Commerce City has approved the Urban Rodent Control Agreement, its execution is either imminent or has already happened, and Commerce City has said that the killing of these prairie dogs may begin as early as Sunday, September 15, 2019—less than two weeks from now. Without a TRO or a PI, Wildlife Services can begin killing these prairie dogs in the immediate future, and the killing of those prairie dogs is a real and irreparable injury. *See Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 737 (9th Cir. 2001) ("Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often

permanent or at least of long duration, *i.e.*, irreparable,") (quoting *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 541, 545 (1987)).

### C. The final two factors—public interest and balance of harms—are jointly considered and also favor awarding Prairie Protection a TRO and a PI.

"When the government is the opposing party, it is appropriate for the Court to consider jointly the balance of harms and public interest." *Wyoming v. United States DOI*, 136 F. Supp. 3d 1317, 1349 (D. Wyo. 2015) (citing *Nken v. Holder*, 556 U.S. 418, 435, 129 S. Ct. 1749, 173 L. Ed. 2d 550 (2009)). As such, since the Defendants are the government, the last two factors can be considered together, and they favor Prairie Protection.

There is no public interest at stake in whether Wildlife Services should be allowed to implement the Urban Rodent Control Agreement to kill prairie dogs for Commerce City at a taxpayer subsidized rate. Indeed, even if the Court were to ignore the taxpayer subsidies which arguably eliminate any economic damages Wildlife Services could claim, the only possible damage to Wildlife Services is that it will be delayed from recouping the estimated $23,300.00 fee until after trial. If Wildlife Services ultimately prevails in this litigation, at that time it can implement the Urban Rodent Control Agreement and collect its fee, with economic damages at most amounting to a small amount of interest. This miniscule amount of economic damages is far outweighed by the irreparable injury that would occur if the TRO and/or PI are not issued. *See, e.g., Colo. Wild v. United States Forest Serv.*, 299 F. Supp. 2d 1184, 1190 (D. Colo. 2004) (holding that plaintiff's irreparable environmental injury outweighed Forest Service's potential economic injury); *see also Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 738 (9th Cir. 2001) ("Westours has asserted financial damages premised upon its contracts of carriage. Its

loss of anticipated revenues, however, does not outweigh the potential irreparable damage to the environment.").

The potential damage from a TRO is even more insignificant. A TRO can at most last for 14 days. Fed. R. Civ. P. 65(b)(2). There is no justification for a rush to kill the Second Creek Prairie Dog Colony within the next two weeks when Commerce City has been considering how to manage the Second Creek Prairie Dogs for at least the past six months. As such, issuing a TRO for that small amount of time will preserve the status quo and give enough time for Wildlife Services to be given more formal notice and to present their position to this Court.

Finally, in regards to the balancing of equities it is critical that Prairie Protection is merely asking for the Court to preserve the status quo. The Second Creek Prairie Dogs are currently alive, and will be killed by Wildlife Services if the TRO and PI are not issued. A TRO and a PI are appropriate to preserve the status quo of allowing the Second Creek Prairie Dogs to live until trial of this matter is concluded.

## IV. PAYMENT OF SECURITY

Prairie Protection would ask the Court to limit the required security to the amount of $500.00, which should cover any interest damages Wildlife Services may have.

## V. ATTEMPTS TO PROVIDE NOTICE OF REQUESTED TRO

Pursuant to Fed. R. Civ. P. 65(b)(1)(B), attached hereto is a declaration from Michael Frandina setting forth the efforts made to give notice to the Defendants (including a call to Martin Lowney, Wildlife Services Director for Colorado, an email to Janet Bucknall, the Deputy Administrator of Wildlife Services named as a defendant in that capacity, and a fax to Wildlife

Services' headquarters) and the reasons why additional notice should not be required before a TRO is issued.

## VI. REQUEST FOR EXPEDITED HEARING

Prairie Protection hereby requests an expedited hearing on this Motion.

## VII. CONCLUSION

WHEREFORE, Plaintiff Prairie Protection prays that the Court grant the Motion for Temporary Restraining Order and Preliminary Injunction, preserve the status quo until trial by entering a Temporary Restraining Order and a Preliminary Injunction that will enjoin Defendants from killing the prairie dogs or otherwise implementing the Urban Rodent Control Agreement, waive the bond requirement, and award any such further relief as this Court deems just and proper under the circumstances.

Respectfully submitted this 6th day of September, 2019.

                                                THE ASKMAN LAW FIRM LLC

                                               *s/ Michael M. Frandina*
Michael M. Frandina
1543 Champa St., Suite 400
Denver, CO 80202
Phone: (720) 407-4331
michael@askmanlaw.com

*ATTORNEYS FOR PLAINTIFF*
*PRAIRIE PROTECTION COLORADO*