IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez

Civil Action No. 19-cv-2537-WJM-KLM

PRAIRIE PROTECTION COLORADO, a Colorado non-profit corporation,

    Plaintiff,

v.

USDA APHIS WILDLIFE SERVICES, a federal agency; and
JANET L. BUCKNALL, Deputy Administrator, USDA APHIS Wildlife Services;

    Defendants.

## ORDER DENYING AS-CONSTRUED MOTION FOR APA § 705 STAY

    Plaintiff Prairie Protection Colorado is an organization that "advocates for prairie dogs and for the conservation and restoration of prairie ecosystems throughout Colorado." (ECF No. 12 ¶ 8.) Defendant USDA APHIS Wildlife Services is a division of the Animal and Plant Health Inspection Service within the United States Department of Agriculture. (*Id.* ¶ 5.) Defendant Janet L. Bucknall is the division's deputy administrator, and is sued in her official capacity. (*Id.* ¶ 6.) For simplicity, the Court will refer to Bucknall and the division she administers collectively as "Defendant."

    Plaintiff brings this action under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 500 *et seq.*, asking the Court to declare that Defendant is statutorily barred from carrying out a contract to kill prairie dog colonies in Commerce City, Colorado. Currently before the Court is Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction. (ECF No. 5.) The Court previously denied the TRO portion of this motion and called for further briefing on the preliminary injunction portion, which the

Court construes as a motion for stay of agency action under 5 U.S.C. § 705. (*See* ECF No. 13.) After receiving full briefing, the Court announced that no evidentiary hearing was necessary and that it planned to deny a stay of agency action for reasons to be explained in a forthcoming order. (ECF No. 24.) This is that order.

For the reasons explained below, the Court finds that Plaintiff lacks prudential standing to sue under the statute in question. Therefore, Plaintiff has not shown a likelihood of success on the merits and a stay of agency action would be inappropriate.

## I. LEGAL STANDARD

Plaintiff explicitly moves for a preliminary injunction under Federal Rule of Civil Procedure 65. (*See* ECF No. 5 at 1.)[1] Because this case seeks review of agency action under the APA, the proper authority for preliminary relief is 5 U.S.C. § 705:

> When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court . . . may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

But the distinction between Rule 65 and § 705 is mostly technical because a § 705 stay is a provisional remedy in the nature of a preliminary injunction, *see Winkler v. Andrus*, 614 F.2d 707, 709 (10th Cir. 1980), and its availability turns on the same four factors considered under a traditional Rule 65 analysis, *see, e.g.*, *Hill Dermaceuticals, Inc. v. U.S. Food & Drug Admin.*, 524 F. Supp. 2d 5, 8 (D.D.C. 2007).[2] Those factors are: (1) a

---

[1] All citations to ECF page numbers are to the page number in the CM/ECF header, which does not always match the document's internal pagination.

[2] The major practical difference, it appears, between a Rule 65 proceeding and a § 705 proceeding is that Rule 65(c) requires a court granting an injunction to consider a bond amount,

2

likelihood of success on the merits, (2) a threat of irreparable harm, which (3) outweighs any harm to the non-moving party, and that (4) the injunction would not adversely affect the public interest. *See, e.g.*, *Awad v. Ziriax*, 670 F.3d 1111, 1125 (10th Cir. 2012). A preliminary injunction is an extraordinary remedy; accordingly, the right to relief must be clear and unequivocal. *See, e.g.*, *Flood v. ClearOne Commc'ns, Inc.*, 618 F.3d 1110, 1117 (10th Cir. 2010).

## II. BACKGROUND

In light of the parties' submissions, the Court finds the following to be undisputed for present purposes.

Within Commerce City is an open-space area sometimes called the "Second Creek Open Space," taking its name from Second Creek, a small watercourse running through it. Second Creek Open Space covers about 120 acres and is mostly bounded by residential neighborhoods.

A prairie dog colony lives within the open space. The colony's ability to expand geographically is limited by the boundaries of the open space, so the prairie dogs have overgrazed the area, creating various problems.

In late August of this year, Commerce City contracted to pay Defendant $23,300 to exterminate the Second Creek colony, and perhaps others. That contract is known as the "Cooperative Service Agreement" (ECF No. 5-1 at 14), although, for reasons that will become clear below, Plaintiff insists on calling it the "Urban Rodent Control Agreement." The Cooperative Service Agreement obligates Defendant "to treat approximately 200 acres of prairie dog colonies throughout Commerce City." (*Id.* at 18.)

---

whereas § 705 contains no such requirement.

Again, Second Creek is 120 acres total. It is not clear how many of those 120 acres are covered by prairie dog colonies—in other words, how many of the 200 acres contemplated by the Agreement are within Second Creek Open Space—nor where the other colonies are located.

Defendant, in a brief filed with this Court on September 16, 2019, said that "no prairie dog management will begin until September 24, 2019, at the earliest." (ECF No. 20 at 4.) September 24 was six days ago. The parties have not informed the Court whether any extermination efforts have begun.

### III. ANALYSIS

Plaintiff argues that an obscure statute prohibits Defendant from exterminating prairie dogs in urban areas. The statute reads as follows:

> On and after December 22, 1987, the Secretary of Agriculture is authorized, except for urban rodent control, to conduct activities and to enter into agreements with States, local jurisdictions, individuals, and public and private agencies, organizations, and institutions in the control of nuisance mammals and birds and those mammal and bird species that are reservoirs for zoonotic diseases, and to deposit any money collected under any such agreement into the appropriation accounts that incur the costs to be available immediately and to remain available until expended for Animal Damage Control activities.

7 U.S.C. § 8353. Plaintiff argues that Commerce City is urban and a prairie dog is a rodent, so the "urban rodent control" exception obviously applies here. (ECF No. 5 at 5–7.) Defendant counters that "urban rodent control" does not refer to extermination of any member of the order *Rodentia* found within an urban area, but instead to extermination of "urban rodents," *i.e.*, rodents normally associated with urban infestations, such as rats and mice. (ECF No. 20 at 9, 17–19.)

The Court need not decide between the parties' competing interpretations

4

because, whatever it means, Congress never intended the statute in general, or the urban rodent control exception in particular, to create a basis for a wildlife protection group to have standing to sue for administrative review. However, before the Court can explain that conclusion, it must first address a more fundamental question of subject matter jurisdiction.

**A.      Article III Standing**

Article III of the U.S. Constitution restricts federal courts to deciding "cases" and "controversies." *See* U.S. Const. art. III, § 2, cl. 1. These words have been interpreted to restrict federal courts from giving "advisory opinions," *Flast v. Cohen*, 392 U.S. 83, 96 (1968), meaning that a federal court may not resolve questions in the abstract, but instead may only resolve "disputes arising out of specific facts when the resolution of the dispute will have practical consequences to the conduct of the parties," *Columbian Fin. Corp. v. BancInsure, Inc.*, 650 F.3d 1372, 1376 (10th Cir. 2011).

To safeguard this restriction, the Supreme Court has articulated a three-element test for "Article III standing":

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of . . . . Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (citations omitted; certain alterations incorporated).

"Article III standing is jurisdictional; thus, where the record reveals a colorable standing issue, [federal courts] have a duty to undertake an independent examination

5

(*sua sponte* if necessary) of that issue." *In re Peeples*, 880 F.3d 1207, 1212 (10th Cir. 2018) (internal quotation marks omitted). Here, however, the Court need not raise the issue *sua sponte* because Defendant explicitly argues that this Court cannot issue an order that is likely to redress Plaintiff's claimed injury. (ECF No. 20 at 11–13.) More specifically, Defendant says that Commerce City will kill the Second Creek prairie dog colony through a private contractor if Defendant does not have power to do it. (*Id.* at 12.) Thus, the injury Plaintiff seeks to prevent—the destruction of the prairie dogs—will happen no matter what. Defendant supports this claim with a declaration from Commerce City's Parks & Streets Operations Manager, Willis Waterhouse, who says:

> Through its budget processes, the City has appropriated the funds necessary for completing the Project. City staff has identified a number of private sector service providers who are capable of completing the Project. In the event that [Defendant] is unable to complete the Project, the City would intend to pursue the same wildlife management services from a private sector provider.

(ECF No. 20-14 ¶ 8.) *Cf. Zeppelin v. Fed. Highway Admin.*, 293 F. Supp. 3d 1267, 1282, 1285–88 (D. Colo. 2017) (plaintiffs did not have standing to challenge certain federal agency decisions made in concert with a municipality where the municipality was responsible for the injury-creating actions and the municipality would go forward with those actions even if the court declared the federal agency decisions invalid).

In reply, Plaintiff submits a bid from a private exterminator which Plaintiff represents to show that a private exterminator would be significantly more expensive—in the range of $36,000 to $75,000—meaning that Commerce City might be required to scale back the scope of the extermination:

> Whatever the City may "intend" to do, Mr. Waterhouse does not provide any detail on whether the City has obtained other bids, or what those bids would cost, or how the City would

6

> handle the increased cost. Budgets are necessarily a zero
> sum proposition, and if Commerce City was required to pay
> this significantly higher price then it will not be able to do as
> much killing.

(ECF No. 23 at 9.)

However, Plaintiff's bid from a private exterminator does *not* say that it would charge $36,000 to $75,000. The bid actually offers to perform the work in the Second Creek area for a "rough estimate" of between $16,375 and $22,550. (ECF No. 23-2 at 1.) Specifically, the bidder: (a) examined the Second Creek Open Space and seven adjacent vacant parcels; (b) determined the acreage per parcel affected by prairie dogs; (c) assumed there would be "60 to 75 burrows per acre" (although "[s]ome lots may have far fewer burrows per acre"); and (d) multiplied those burrow ranges per parcel by a per-burrow charge of between $3.00 and about $3.30. (*Id.*) Again, the total of all of these estimates is $16,375 and $22,550.

How, then, does Plaintiff derive an estimate of $36,000 to $75,000? Plaintiff draws from the exterminator's general methodology of assuming 60–75 burrows per acre of prairie dog territory and its charges of "$3.00 for each burrow fumigated with aluminum phosphide and $5.00 for each burrow fumigated with carbon monoxide gas cartridges." (*Id.*) Plaintiff then announces that the total acreage of affected prairie dog habitat is 200, as stated in the Cooperative Service Agreement. (*See* ECF No. 5-1 at 18.) Again, it is not clear how many of the 200 acres are within the Second Creek Open Space. But, at 200 total acres, Plaintiff estimates the total number of burrows at between 12,000 (200 acres x 60 burrows per acre) and 15,000 (200 x 75), for a total potential cost of between $36,000 (12,000 burrows x $3.00 per burrow) and $75,000 (15,000 x $5.00). (ECF No. 23 at 9 & n.4.)

7

It is worth noting that the exterminator never made any estimates based on a presumed cost of $5.00 for all burrows within a given parcel.  Rather, the exterminator stated that aluminum phosphide (the $3.00 option) would be used "[f]or most burrows," with carbon monoxide (the $5.00 option) only used "[f]or any burrows that are within one hundred (100) feet of an occupied building."  (ECF No. 23-2 at 2.)  For some parcels that were not near enough to any occupied buildings, the exterminator's estimate relies entirely on the $3.00 option.  (*See, e.g.*, *id.* at 1 (estimating that "Lot D" would cost between $900 and $1125 for 300 to 375 active burrows).)  For the other parcels, the exterminator used a per-burrow estimate of between $3.23 and $3.30—presumably a weighted average as between the number of burrows that would require aluminum phosphide versus carbon monoxide.  (*See, e.g.*, *id.* (estimating that "Lots A, H & I" would cost between $8,100 and $11,000 for 2,500 to 3,350 active burrows).)  Obviously that average is skewed heavily toward the $3.00 service.

Thus, assuming all of the "approximately 200 acres of prairie dog colonies throughout Commerce City" (ECF No. 5-1 at 18) will be eliminated, the better estimate, using the private exterminator's numbers, is $36,000 (12,000 burrows x $3.00 per burrow) to $49,500 (15,000 x $3.30).  On this limited record, the Court finds this enough to sustain Plaintiff's theory of Article III standing.  The Waterhouse declaration states only generically that "the City has appropriated the funds necessary for completing the Project."  (ECF No. 20-14 ¶ 8.)  Waterhouse provides no numbers, nor any supporting documents.  Thus, on this record, it is unreasonable to assume that Commerce City has already appropriated, or will authorize, the full potential amount it might have to pay to a private contractor.  And if it does not, Plaintiff has made a sufficient showing that at least

some prairie dogs must be spared if the budget for extermination is $23,300.

For this reason, Plaintiff has adequately demonstrated Article III standing.[3]

**B.      Prudential Standing & "Zone of Interests"**

The APA declares that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. This means that "the plaintiff must establish that the injury he complains of (*his* aggrievement, or the adverse effect *upon him*) falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." *Lujan*, 497 U.S. at 883 (emphasis in original).

> Thus, for example, the failure of an agency to comply with a statutory provision requiring "on the record" hearings would assuredly have an adverse effect upon the company that has the contract to record and transcribe the agency's proceedings; but since the provision was obviously enacted to protect the interests of the parties to the proceedings and not those of the reporters, that company would not be "adversely affected within the meaning" of the statute.

*Id.*

This form of standing, often known as "prudential standing," does not just look at the "zone of interests" Congress intended to protect, but whether the plaintiff is

---

[3] The Court rejects Plaintiff's additional arguments for Article III standing. Plaintiff says that "if [it] prevails [in this lawsuit,] it will prevent [Defendant] from killing prairie dogs in . . . other urban areas." (ECF No. 23 at 9.) But Plaintiff must have standing in *this case* first. Moreover, the undersigned's rulings are not binding on any other judge or court. *See Hernandez v. Ray Domenico Farms, Inc.*, 250 F. Supp. 3d 789, 801 (D. Colo. 2017). Plaintiff further says that a ruling in its favor would mean, at a minimum, that a private contractor without governmental immunity would need to carry out the extermination, so if an adjacent property owner was negatively affected by the extermination activities, it could sue the private contractor without the barrier of governmental immunity. (*Id.* at 10.) It is not at all clear, however, that Defendant would be immune from a Federal Tort Claims Act lawsuit. In any event, this form of potential redress (if that is the right word) is far too speculative to support standing.

"*arguably* within the zone of interests to be protected or regulated by the statute." *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970) (emphasis added). And the test

> is not meant to be especially demanding. [Courts] apply the test in keeping with Congress's evident intent when enacting the APA to make agency action presumptively reviewable. We do not require any indication of congressional purpose to benefit the would-be plaintiff. And we have always conspicuously included the word "arguably" in the test to indicate that the benefit of any doubt goes to the plaintiff. The test forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012) (citations and certain internal quotation marks omitted).

While acknowledging the general lenience of the prudential standing test, the Court nonetheless finds that Plaintiff's interests "are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id*. This is so for three principal reasons.

First, the statute in question, 7 U.S.C. § 8353, is not a wildlife protection statute. It is, rather, an authorization to "control"—in most cases, a euphemism for "kill"—"nuisance mammals and birds and those mammal and bird species that are reservoirs for zoonotic diseases."

Second, the urban rodent control exception is manifestly not intended to protect "urban rodent[s]," whether one conceives of that phrase to mean any rodent in an urban area (Plaintiff's view) or rodents that are generally associated with urban infestations (Defendant's view). To begin, Plaintiff fails to offer any reason why Congress might

have wanted to preserve urban rodent populations. But more importantly, the exception protects urban rodents only from being killed by Department of Agriculture employees. Anyone else may continue to kill urban rodents with impunity, as far as the statute is concerned.

Third, although there is no legislative history regarding the urban rodent control exception, later Congressional and regulatory action points toward Congress's and the Department of Agriculture's understanding that the exception was meant to avoid usurping business opportunities for private exterminators. A 2007 bill passed by the Senate—but ultimately not by the full Congress—included findings about the economic importance of the private pest management industry and the need for Defendant to take the urban rodent control exception seriously when private exterminators could do the job. *See* 153 Cong. Rec. S15653-03, at 2007 WL 4364201 (Dec. 14, 2007). And, in a 2013 policy statement in the Federal Register, Defendant announced the following:

> While [§ 8353] makes an exception for urban rodent control, it does not define the term. This has led to confusion about when [Defendant] may provide wildlife damage control assistance and has created an overlap in services with private sector pest control companies in urban and suburban areas.
>
> The term "rodent" refers to the group of mammals that includes rats, mice, chipmunks, squirrels, porcupines, and groundhogs, among other species. Therefore, to maximize Federal resources and reduce duplication of services, we are considering "urban rodent control," for the purposes of activities authorized by [§ 8353], to mean actions to directly control mice, rats, voles, squirrels, chipmunks, gophers, and woodchucks/groundhogs in a city or town with a population greater than 50,000 inhabitants, as well as the urbanized area contiguous and adjacent to such a city or town.
>
> There are some categories of actions for which [Defendant] will continue to consider requests for operational assistance. Specifically, actions involving Federal agencies; government

11

> entities engaged in a cooperative service agreement with
> [Defendant] to provide direct control of rodents as of October
> 1, 2013; a State in which direct control of the rodent species
> has been expressly authorized by State law, rulemaking, or
> a local jurisdiction's ordinance promulgated by public notice
> and an opportunity for public comment or as otherwise
> promulgated as required and authorized by the respective
> State or local law; and railways and airport air sides areas
> are excluded from this definition. Otherwise, [Defendant] will
> refer all requests for operational assistance with urban
> rodent control from private entities such as home and
> business owners and associations to private sector pest
> control companies.

78 Fed. Reg. 49445, 49446 (Aug. 14, 2013).[4]

Plaintiff counters that, "[s]ince an urban area is more populated than a rural area, the application of rodenticides in an urban area puts more people (and their pets and service animals) at risk of harm. . . . [I]ndividuals that are impacted by [this risk] clearly fit within the [statute's] 'zone of interests.'" (ECF No. 23 at 7.) But as far as the statute is concerned, private exterminators may employ all the same rodenticides, creating the same risk. Moreover, rodenticides are regulated by a separate statute, the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. §§ 136–136y.

In sum, there is no reasonable way to view § 8353 and its urban rodent control exception as even arguably bringing animal protection, or protection of humans from chemicals, within its zone of interests. Thus, Plaintiff lacks prudential standing, and is

---

[4] In its reply brief, Plaintiff says that this "informal policy" is "not entitled to deference." (ECF No. 23 at 5.) This contradicts Plaintiff's position in its motion where it cited this same Federal Register action for the notion that "urban rodent control" at least means control of rodents within a city or town with a population greater than 50,000 inhabitants (Plaintiff failed to mention that Defendant's definition was tied to a list of specific rodents that did not include prairie dogs). (ECF No. 5 at 6; *see also* ECF No. 13.) Regardless, the question is not whether the policy is entitled to deference, but what it says about the Department of Agriculture's understanding of why the urban rodent control exception exists. Especially when the legislative history on a decades-old statute is so thin, the understanding of the agency that has administered the statute since its enactment surely has significant probative value.

therefore unlikely to succeed on the merits of this lawsuit. In consequence, Plaintiff is not entitled to a stay of agency action.

## IV. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1. The preliminary injunction portion of Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction and Request for Expedited Hearing (ECF No. 5), which the Court construes as a motion for stay of agency action under 5 U.S.C. § 705, is DENIED, and therefore the motion is denied in its entirety; and

2. Plaintiff is ORDERED TO SHOW CAUSE, on or before **October 10, 2019**, why this action should not be dismissed due to Plaintiff's lack of prudential standing.

Dated this 30th day of September, 2019.

BY THE COURT:

_____
William J. Martinez
United States District Judge