**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 19-cv-2537-WJM-KLM

PRAIRIE PROTECTION COLORADO, a Colorado non-profit corporation,

    Plaintiff,

v.

USDA APHIS WILDLIFE SERVICES, a federal agency; and
JANET L. BUCKNALL, Deputy Administrator, USDA APHIS Wildlife Services;

    Defendants.

---

**ORDER MAKING ORDERS TO SHOW CAUSE ABSOLUTE AND GRANTING DEFENDANT'S MOTION TO DISMISS**

---

Plaintiff Prairie Protection Colorado is an organization that "advocates for prairie dogs and for the conservation and restoration of prairie ecosystems throughout Colorado." (ECF No. 34 ¶ 8.) Defendant USDA APHIS Wildlife Services is a division of the Animal and Plant Health Inspection Service within the United States Department of Agriculture. (*Id.* ¶ 5.) Defendant Janet L. Bucknall is the division's deputy administrator, and is sued in her official capacity. (*Id.* ¶ 6.) For simplicity, the Court will refer to Bucknall and the division she administers collectively as "Defendant."

In the currently operative complaint, Plaintiff sues Defendant under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*, and under the Court's inherent equitable authority to enjoin unlawful executive action. The executive action at issue is Defendant's extermination of prairie dogs in Commerce City, Colorado.

Currently before the Court are:

- an order to show cause dated September 30, 2019 why this case should not be dismissed for lack of prudential standing ("First OSC") (ECF No. 25 at 13);

- an order to show cause dated October 23, 2019 why this case should not be dismissed as moot ("Second OSC") (ECF No. 37); and

- Defendant's Motion to Dismiss the Second Amended Complaint Under Rule 12(b)(1) and Rule 12(b)(6) ("Motion to Dismiss") (ECF No. 49).

The Court previously informed the parties that, "either explicitly or by incorporation, the Motion to Dismiss addresses all of the matters raised in the Court's two orders to show cause. Accordingly, the Court will take up its orders to show cause and the Motion to Dismiss together, in due course." (ECF No. 52.) This is that order.

For the reasons explained below, the Court makes both OSCs absolute and grants the Motion to Dismiss. As a consequence, the Court denies as moot an additional pending motion, Plaintiff's Motion to Complete the Administrative Record. (ECF No. 71.)

## I. BACKGROUND & FACTUAL ALLEGATIONS

Plaintiff argues that an obscure statute prohibits Defendant from exterminating prairie dogs in urban areas. The statute reads as follows:

> On and after December 22, 1987, the Secretary of Agriculture is authorized, *except for urban rodent control*, to conduct activities and to enter into agreements with States, local jurisdictions, individuals, and public and private agencies, organizations, and institutions in the control of nuisance mammals and birds and those mammal and bird species that are reservoirs for zoonotic diseases, and to deposit any money collected under any such agreement into the appropriation accounts that incur the costs to be available immediately and to remain available until expended

for Animal Damage Control activities.

7 U.S.C. § 8353 (emphasis added).

The nub of the parties' dispute is the meaning of "urban rodent control."  Plaintiff argues that Commerce City is urban and a prairie dog is a rodent, so "except for urban rodent control" bars Defendant from exterminating prairie dogs in Commerce City. (ECF No. 50 at 4.)  Defendant says that "urban rodent control" does not refer to extermination of any member of the order *Rodentia* found within an "urban" area, but instead to extermination of "urban rodents," *i.e.*, rodents normally associated with urban infestations, such as rats and mice.  (ECF No. 49 at 4–9.)

Plaintiff filed suit on September 6, 2019.  (ECF No. 1 or "Original Complaint.") The core of the Original Complaint was as follows:

- a prairie dog colony "lives in . . . Commerce City on open space near Second Creek" (*id.* ¶ 27);
- Defendant is an agency that specializes in "managing problems caused by wildlife" (*id.* ¶ 18 (internal quotation marks omitted));
- on August 19, 2019, Commerce City entered into a "Cooperative Service Agreement" with Defendant, under which Commerce City agreed to pay Defendant $23,300 in exchange for Defendant exterminating the Second Creek prairie dog colony (*id.* ¶¶ 2, 32, 34); but
- the urban rodent control exception prohibits Defendant from carrying out that agreement (*id.* ¶ 2).

Plaintiff therefore asserted two causes of action: (1) "*Ultra Vires* - APA," because Defendant was preparing to act "in excess of statutory jurisdiction, authority, or

limitations, or short of statutory right," 5 U.S.C. § 706(2)(C); and (2) "Arbitrary and Capricious - APA," because entering into and carrying out the Cooperative Service Agreement was or would be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id.* § 706(2)(A).

The same day Plaintiff filed its complaint, it filed a Motion for Temporary Restraining Order and Preliminary Injunction. (ECF No. 5.) The Court construed the motion as one for a stay of agency action under 5 U.S.C. § 705 (ECF No. 13), and denied the motion by order dated September 30, 2019 ("Order Denying Stay"), *see Prairie Prot. Colorado v. USDA APHIS Wildlife Servs.*, 2019 WL 4751785, at *1 (D. Colo. Sept. 30, 2019) (ECF No. 25). The Court reasoned that Plaintiff is not within the "zone of interests" that Congress intended to protect in 7 U.S.C. § 8353, and therefore Plaintiff lacks prudential standing to challenge Defendant's actions under the APA. (ECF No. 25 at 9–13 (reasoning that, whatever "urban rodent control" means, the statute is not an animal protection statute and the urban rodent control exception was meant to protect private exterminators, *i.e.*, to prevent Defendant from encroaching on their business).) Within the same order, the Court issued the First OSC, requiring Plaintiff to demonstrate why the action should not be dismissed for lack of prudential standing. (*Id.* at 13.)

On October 10, 2019, Plaintiff responded to the First OSC and concurrently filed an opposed motion for leave to file a second amended complaint (the first of two proposed "second amended" complaints, as will become clear below). (ECF Nos. 26, 27.)[1] The proposed complaint offered substantially the same factual allegations but

---

[1] Plaintiff had filed a first amended complaint as of right while its Motion for Temporary Restraining Order and Preliminary Injunction was pending. (*See* ECF No. 12.) That complaint

4

changed the legal basis underlying Plaintiff's first theory of relief. Specifically, rather than asserting a claim for "*Ultra Vires* - APA," Plaintiff dropped the reference to the APA and invoked the Court's inherent equitable authority to enjoin federal officials from violating federal law. (ECF No. 27-1 at 12.) In other words, Plaintiff proposed to assert a freestanding *ultra vires* claim, rather than an APA-based *ultra vires* claim. In Plaintiff's view, this reframing of the cause of action avoided the prudential standing problem raised in the Order Denying Stay and First OSC. Plaintiff's second proposed theory of relief, however, continued to invoke the APA and its "arbitrary and capricious" language. (*Id.*)

On October 22, 2019—while Plaintiff's motion to amend and the First OSC were still pending—Defendant filed a notice that it had "completed the prairie dog management services" it had agreed to perform under the Cooperative Service Agreement. (ECF No. 32 at 1.)

The next day (October 23, 2019), Plaintiff filed a Notice of Amendment by Consent. (ECF No. 33.) As the title of the notice suggests, Defendant had now agreed to permit Plaintiff to file a second amended complaint. (*Id.* ¶ 1.) This version of the second amended complaint (hereinafter, "Second Amended Complaint," ECF No. 34) is partly congruent with and partly broader than the version proposed on October 10, 2019:

- as to the first claim for relief, the Second Amended Complaint drops the reference to the APA, making it a freestanding *ultra vires* claim, as proposed in the October 10 version ("Claim 1");

---

is not relevant to the current proceedings.

- as to the second claim for relief, the Second Amended Complaint preserves the "arbitrary and capricious" APA claim, as originally pleaded ("Claim 2"); and

- the Second Amended Complaint adds a third claim for relief, asserted under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4231 et seq. ("Claim 3").

As the basis for Claim 3, Plaintiff alleges that Defendant avoided preparing an environmental analysis or environmental impact statement concerning extermination of the Second Creek prairie dogs by issuing a categorical exclusion instead; but, says Plaintiff, a categorical exclusion was inappropriate under the circumstances. (ECF No. 34 ¶¶ 47–58.) The categorical exclusion in question, which Plaintiff attaches to the Second Amended Complaint, is dated September 25, 2019, but was approved on September 26, 2019. (ECF No. 34-2 at 1, 5.)

Later on the same day that Plaintiff filed the Second Amended Complaint, the Court issued the Second OSC, requiring Plaintiff to demonstrate "why this action should not be dismissed as moot" in light of the previous day's notice from Defendant that extermination of the prairie dogs was complete. (ECF No. 37.) Plaintiff responded that it had evidence that some prairie dogs usually survive the first wave of extermination, and that Commerce City was committed "to poison[ing] the prairie dogs at Second Creek until they are gone," meaning "that [Defendant] will need to follow up with future poisonings at Second Creek." (ECF No. 48 at 4.) In a supplement filed several months later, Plaintiff submitted a declaration stating that follow-up extermination was indeed taking place, beginning in April 2020, although conducted by a private contractor. (ECF

No. 72-1 ¶¶ 3–4.)

## II.  LEGAL STANDARD

Defendant brings its Motion to Dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  As it turns out, only Rule 12(b)(1) is relevant here.

Rule 12(b)(1) permits a party to move to dismiss for "lack of subject-matter jurisdiction."  "[Federal] [d]istrict courts have limited subject matter jurisdiction and may [only] hear cases when empowered to do so by the Constitution and by act of Congress." *Radil v. Sanborn W. Camps, Inc.*, 384 F.3d 1220, 1225 (10th Cir. 2004) (internal quotation marks omitted).  "A court lacking jurisdiction cannot render judgment but must dismiss the case at any stage of the proceedings in which it becomes apparent that jurisdiction is lacking."  *Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir. 1974).

Rule 12(b)(1) motions generally take one of two forms: a facial attack or a factual attack.  *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995).  A facial attack questions the sufficiency of the complaint as to its subject matter jurisdiction allegations.  *Id.*  In reviewing a facial attack, courts accept all well-pleaded allegations as true, as in a Rule 12(b)(6) setting.  *Id.*  A factual attack, by contrast, "may go beyond allegations contained in the complaint and challenge the facts upon which subject matter jurisdiction depends."  *Id.* at 1003.

Here, both sides attach extra-pleading declarations to their papers, so both the attack and the defense are factual, not merely facial.  In these circumstances, the Court has "wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts."  *Id.* at 1002.  Furthermore, the Court's

7

reference to evidence beyond the pleadings will not convert the motion to one under Rule 56, unless the jurisdictional question is intertwined with the merits of the case. *Id.* As will become clear below, the jurisdictional question is independent from the merits of this case.

### III.  ANALYSIS

**A.  Article III Standing: General Principles**

Article III of the U.S. Constitution restricts federal courts to deciding "cases" and "controversies." *See* U.S. Const. art. III, § 2, cl. 1. These words have been interpreted to restrict federal courts from giving "advisory opinions." *Flast v. Cohen*, 392 U.S. 83, 96 (1968). In other words, a federal court may not resolve questions in the abstract, but instead may only resolve "disputes arising out of specific facts when the resolution of the dispute will have practical consequences to the conduct of the parties." *Columbian Fin. Corp. v. BancInsure, Inc.*, 650 F.3d 1372, 1376 (10th Cir. 2011).

To safeguard this restriction, the Supreme Court has articulated a three-element test for "Article III standing":

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'"  Second, there must be a causal connection between the injury and the conduct complained of . . . .  Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (citations omitted; certain alterations incorporated).

"Article III standing is jurisdictional; thus, where the record reveals a colorable standing issue, [federal courts] have a duty to undertake an independent examination

8

(*sua sponte* if necessary) of that issue." *In re Peeples*, 880 F.3d 1207, 1212 (10th Cir. 2018) (internal quotation marks omitted). But "Article III standing [is judged] at the outset of the litigation." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000) ("*Laidlaw*"). Thus, as discussed below, if the facts that created standing at the beginning of the litigation disappear, standing itself does not necessarily disappear. Whether the case can proceed is instead judged based on a different set of principles regarding "mootness."

**B.     Claim 1: Non-APA *Ultra Vires* Review**

1.     Nature of the Claim

Federal courts have authority "to enjoin unlawful executive action," apparently arising from "a long history of judicial review of illegal executive action, tracing back to England." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). The contours of this equitable claim are ill-defined. Plaintiff asserts the claim under the assumption that it avoids the zone of interests test on which the Court relied in the Order Denying Stay, because that test arises specifically from the APA. *See* 5 U.S.C. § 702 ("[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action *within the meaning of a relevant statute*, is entitled to judicial review thereof" (emphasis added)). But even if the Court will not engage in an APA-mandated zone of interests inquiry, it does not necessarily follow that Congress intended anyone with Article III standing to be able to bring a claim for violation of 7 U.S.C. § 8353. *Cf. Armstrong*, 575 U.S. at 327–28 ("Courts of equity can no more disregard statutory and constitutional requirements and provisions than can courts of law." (internal quotation marks omitted)).

However, for the reasons explained below, the Court agrees with Defendant that

9

this claim, whatever its nature, is moot. The Court therefore need not decide the scope of a non-APA *ultra vires* claim based on the federal government's alleged violation of a federal statute.

### 2. Mootness

If a party establishes Article III standing at the beginning of the case (injury-in-fact, causation, and redressability), the case may nonetheless "become[] moot when [the] plaintiff no longer suffers actual injury that can be redressed by a favorable judicial decision." *Ind v. Colo. Dep't of Corr.*, 801 F.3d 1209, 1213 (10th Cir. 2015) (internal quotation marks omitted). This case appears moot because the redress Plaintiff seeks—an order preventing Defendant from exterminating the Second Creek prairie dogs (*see* ECF No. 1 at 11–12)—is no longer available. Defendant exterminated the prairie dogs as of October 22, 2019 (or most of them—an issue to which the Court will return below). (ECF No. 32.)

But even if the case is moot in this strict sense, the Court is not required to dismiss if a recognized mootness exception applies. Plaintiff asserts two exceptions, which the Court will address in turn.

#### a. *"Voluntary Cessation"*

Plaintiff first argues that the "voluntary cessation" exception applies. (ECF No. 48 at 2–4; ECF No. 50 at 2–3.) The Tenth Circuit describes this exception as follows:

> One exception to a claim of mootness is a defendant's voluntary cessation of an alleged illegal practice which the defendant is free to resume at any time. This exception is based on the principle that a party should not be able to evade judicial review, or to defeat a judgment, by temporarily altering questionable behavior.

*Chihuahuan Grasslands All. v. Kempthorne*, 545 F.3d 884, 892 (10th Cir. 2008)

(citations and internal quotation marks omitted).

Plaintiff's attempt to apply this exception rests on two premises:

- first, the initial round of poisoning usually does not kill all of the prairie dogs, so follow-up poisonings are usually required; and,
- second, the Cooperative Service Agreement ran through April 24, 2020 (ECF No. 20-8 at 5), meaning that, as of the time Plaintiff asserted these arguments (ECF No. 39 (October 2019); ECF No. 48 (November 2019); ECF No. 50 (December 2019)), Defendant could still return for follow-up poisonings.

The first premise is undisputed on this record, and is otherwise supported by Plaintiff's supplemental brief regarding follow-up extermination (albeit performed by a private contractor). (ECF No. 72.) But the second premise obviously no longer holds true. The Cooperative Service Agreement has since expired under its own terms.

In its supplemental brief, Plaintiff attempts to avoid the significance of expiration by reframing the allegedly voluntarily ceased conduct as Defendant's practice of "actively market[ing]" its extermination services to Commerce City. (*Id.* ¶ 4.) In Plaintiff's view, Defendant stopped marketing those services to Commerce City because of this lawsuit but could resume later. (*Id.* ¶¶ 4–5.) Even if the Court could consider this new theory of injury, it would fail under its own weight for lack of Article III standing. "Marketing" alone, even for a service that Defendant is allegedly barred by statute from providing, causes no cognizable injury to Plaintiff.

In this light, Defendant has not voluntarily ceased. Its contract has simply expired. There is no allegedly "illegal practice which the defendant is free to resume at

11

any time," *Chihuahuan Grasslands*, 545 F.3d at 892, so the voluntary cessation exception to mootness is inapplicable.[2]

        b.      *"Capable of Repetition Yet Evading Review"*

Plaintiff also invokes the "capable of repetition yet evading review" exception to mootness. (ECF No. 39 ¶¶ 3–4.) "The exception arises when: (1) the duration of the challenged action is too short to be fully litigated prior to its cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subjected to the same action again." *Disability Law Ctr. v. Millcreek Health Ctr.*, 428 F.3d 992, 996 (10th Cir. 2005) (internal quotation marks omitted; alterations incorporated). The Court need only discuss the first element of this test. Thus, the Court will assume for the sake of argument that Defendant exterminating prairie dogs in urban areas somewhere else in Colorado (apparently what Plaintiff has in mind) satisfies the second element.[3]

To meet the "too short to be fully litigated" standard, there must be "an *inherent* problem of limited duration that will cause it to evade review in future litigation." *Disability Law Ctr.*, 428 F.3d at 997 (internal quotation marks omitted; emphasis added). In other words, the exception does not apply if something happens too quickly *in a particular case*. *See id.* And if something is happening quickly but "expedited review" could forestall the injury, it is usually not "capable of repetition yet evading review" for

---

[2] Defendant argues that voluntary cessation was inapplicable even before the Cooperative Service Agreement expired. (ECF No. 49 at 3 ("[Defendant] is completely—not temporarily—done with its work under the Agreement") (filed Nov. 20, 2019).) Under the circumstances, the Court need not reach this argument in this context. The Court will instead reach it in the context of Claim 3, where it may make a difference. (*See* Part III.D, below.)

[3] If Plaintiff only has in mind Defendant returning to Second Creek, then the injury is not "capable of repetition" because the Cooperative Service Agreement has expired, as explained in Part III.B.2.a, above.

purposes of mootness doctrine. *Id.*

Here, Plaintiff requested expedited review through its Motion for Temporary Restraining Order and Preliminary Injunction. (ECF No. 5.) Plaintiff lost that motion and Defendant acted relatively quickly after that. The Court could find no authority (and Plaintiff cites none) that losing a motion for a preliminary injunction places the alleged harm into the "capable of repetition yet evading review" category. Thus, Defendant's actions happened too quickly for Plaintiff's purposes in this case, but there is no "inherent problem of limited duration." *Disability Law Ctr.*, 428 F.3d at 997. The "capable of repetition yet evading review" exception therefore does not apply.

\* \* \*

For the foregoing reasons, no mootness exception saves Plaintiff's Claim 1. The Court therefore must dismiss it for lack of subject matter jurisdiction. Thus, the Court makes the Second OSC absolute and, to the same effect, grants Defendant's Motion to Dismiss Claim 1 on this basis.

**C.    Claim 2: APA Review of Actions Taken Under 7 U.S.C. § 8353**

Plaintiff's Claim 2 is essentially the same as Claim 1, except Plaintiff pleads it directly under the APA. Plaintiff's Claim 2 is moot for the same reasons as Claim 1, and therefore must be dismissed for lack of subject matter jurisdiction.

Alternatively, Plaintiff has never answered the First OSC's analysis that Plaintiff is not within the zone of interests that 7 U.S.C. § 8353 or its urban rodent control exception was meant to protect. (ECF No. 25 at 9–13.) Thus, the Court makes the First OSC absolute and Claim 2 must be dismissed for lack of prudential standing.

**D.    Claim 3: APA Review of Actions Taken Under NEPA**

Plaintiff asserts Claim 3 under NEPA. NEPA "require[s] agencies to consider

environmentally significant aspects of a proposed action." *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1162 (10th Cir. 2002). "NEPA dictates the process by which federal agencies must examine environmental impacts, but does not impose substantive limits on agency conduct." *Utah Envtl. Cong. v. Russell*, 518 F.3d 817, 821 (10th Cir. 2008). NEPA merely guards against "uninformed—rather than unwise—agency action." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989).

The fact that NEPA does not require a particular outcome does not necessarily violate the Article III standing requirement of redressability. This is because a violation of NEPA is deemed a "procedural injury," which is "a special relaxation of the normal standards for redressability." *Zeppelin v. Fed. Highway Admin.*, 305 F. Supp. 3d 1189, 1198 (D. Colo. 2018) (internal quotation marks omitted). Although a NEPA plaintiff "cannot represent to a court that a judgment against the agency *would* prevent the feared injury, only that it *could* prevent that injury [because the agency might make a different decision after looking at the problem more closely]," the doctrine of procedural injury says that "'could' is good enough for redressability purposes; the plaintiff need not establish 'would.'" *Id.* at 1198–99 (emphasis in original). But if, under the circumstances of the case, a closer look could *not* yield a different result, then standing for "procedural injury" evaporates. *Id.* at 1199 ("it is not enough that some extra quantum of procedure would redress a procedural harm—it must be reasonably capable of leading the agency to make a decision that would redress the underlying substantive harm").

An agency satisfies its NEPA duties by preparing one of three documents:

14

> (1) an environmental impact statement, (2) an environmental assessment, or (3) a categorical exclusion. An environmental impact statement involves the most rigorous analysis, and is required if a proposed action will "significantly affect[ ] the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.4.
>
> If an agency is uncertain whether the proposed action will significantly affect the environment, it may prepare a considerably less detailed environmental assessment. 40 C.F.R. § 1508.9. An environmental assessment provides "sufficient evidence and analysis" to determine whether a proposed project will create a significant effect on the environment. *Id.* If so, the agency must then develop an environmental impact statement; if not, the environmental assessment results in a "Finding of No Significant Impact," and no further agency action is required. *Id.*
>
> In certain narrow instances, however, an agency is not required to prepare either an environmental assessment or an environmental impact statement. This occurs when the proposed action falls within a categorical exclusion, *i.e.*, those actions predetermined not to "individually or cumulatively have a significant effect on the human environment." *Id.* § 1508.4.

*Utah Envtl. Cong. v. Bosworth*, 443 F.3d 732, 736 (10th Cir. 2006).

Claim 3 asserts that Defendant unlawfully issued a categorical exclusion regarding the extermination of the Second Creek prairie dogs. (ECF No. 34 ¶¶ 47–58.) Defendant acted under a regulation permitting categorical exclusions for

> use . . . of chemicals, pesticides, or other potentially hazardous or harmful substances, materials, and target-specific devices or remedies, provided that such use meets all of the following criteria (insofar as they may pertain to a particular action):
>
> (A) The use is localized or contained in areas where humans are not likely to be exposed, and is limited in terms of quantity, i.e., individualized dosages and remedies;
>
> (B) The use will not cause contaminants to enter water bodies, including wetlands;

15

>> (C) The use does not adversely affect any federally protected species or critical habitat; and
>
> (D) The use does not cause bioaccumulation.

7 C.F.R. § 372.5(c)(1).  (*See also* ECF No. 34-2 at 5.)  Plaintiff says that Defendant could not have reasonably concluded that "humans are not likely to be exposed," given the nearby residences; nor that "use will not cause contaminants to enter water bodies," given Second Creek itself; nor that "use does not adversely affect any federally protected species," given that endangered black-footed ferrets live nearby.  (ECF No. 34 ¶¶ 56–58.)

Defendant argues that Plaintiff never had standing because Defendant notified the Court on October 22, 2019 that it had completed its extermination duties under the Cooperative Service Agreement (ECF No. 32) and Plaintiff filed the Second Amended Complaint, asserting Claim 3 for the first time, on October 23, 2019 (ECF No. 34).[4]  In other words, according to Defendant, Plaintiff filed the Second Amended Complaint one day after any basis for standing evaporated.

Defendant's argument raises an interesting question.  "[A] plaintiff must demonstrate standing for each claim he seeks to press."  *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006); *see also Blum v. Yaretsky*, 457 U.S. 991, 999–1002 (1982) (finding that plaintiffs had standing to assert only one of two asserted claims).  Normally, a party's "Article III standing [is judged] at the outset of the litigation."  *Laidlaw*, 528 U.S. at 180.  But what if the plaintiff does not bring "each claim he seeks to press" "at the outset of the litigation"?  In other words, when a plaintiff amends the complaint to assert a new cause of action, is the plaintiff's standing as to the new cause

---

[4] Defendant does not argue that Claim 3 is moot.

16

of action judged as of the date of the amended complaint or the date of the original complaint?[5]

Defendant's standing challenge shifts the burden to Plaintiff to demonstrate that standing exists. *Lujan*, 504 U.S. at 561; *United States v. Bustillos*, 31 F.3d 931, 933 (10th Cir. 1994). Plaintiff does not argue that "at the outset of litigation" means what it literally seems to say, with no exceptions. Plaintiff instead argues that "relation back" under Federal Rule of Civil Procedure 15(c) applies in this circumstance. (ECF No. 48 at 5; ECF No. 50 at 3 n.3.) Plaintiff nowhere specifies which portion of Rule 15(c) it has in mind, but presumably it is the following: "An amendment to a pleading relates back to the date of the original pleading when * * * the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(1)(B).

The purpose of Rule 15(c) is to provide an exception to the statute of limitations. *See* Fed. R. Civ. P. 15 advisory committee's note to 1966 amendment ("Relation back is intimately connected with the policy of the statute of limitations."); *see also* 6A Charles Alan Wright et al., *Federal Practice & Procedure* § 1496 (3d ed., Apr. 2020 update) ("Rule 15(c) is based on the notion that once litigation involving particular conduct or a

---

[5] It is beyond dispute that the existence of standing at the time of the original complaint to assert the causes of action alleged in the original complaint does not create standing to assert any other cause of action. "The Supreme Court . . . has rejected this 'commutative' theory of standing, foreclosing the legal scenario whereby a plaintiff borrows the injury of one cause of action in an effort to sustain standing in another." *Zeppelin*, 305 F. Supp. 3d at 1200 (quoting *DaimlerChrysler*, 547 U.S. at 352). So the question here is not whether standing to assert the original claims provides standing to assert any amended claim (it does not), but simply the date to which the Court must look to assess standing for the amended claim. In a different case, there might be three potential dates: the date of the amended complaint, the date on which the plaintiff moved to amend the complaint, and the date of the original complaint. Here, there was no motion to amend because Plaintiff filed the Second Amended Complaint by consent. (*See* ECF No. 33.) Thus, in this case, the Court need only decide between the date of the amended complaint and the date of the original complaint.

given transaction or occurrence has been instituted, the parties are not entitled to the protection of the statute of limitations against the later assertion by amendment of defenses or claims that arise out of the same conduct, transaction, or occurrence as set forth in the original pleading."). Plaintiff cites no case in which a court applied Rule 15(c) to sustain Article III standing. The few cases the Court has discovered which address whether relation back can apply to Article III standing answer "no." *See In re Magnum Hunter Res. Corp. Sec. Litig.*, 616 F. App'x 442, 447 (2d Cir. 2015); *Chen-Oster v. Goldman, Sachs & Co.*, 251 F. Supp. 3d 579, 590 (S.D.N.Y. 2017); *Dupree v. Prudential Ins. Co. of Am.*, 2007 WL 2263892, at *33 (S.D. Fla. Aug. 7, 2007); *Doe v. O'Bannon*, 91 F.R.D. 442, 446–47 (E.D. Pa. 1981); *see also Saleh v. Fed. Bureau of Prisons*, 2009 WL 3158120, at *5 (D. Colo. Sept. 29, 2009) (addressing a similar argument, but not with reference to relation-back doctrine).

The Court agrees with these decisions that Article III standing to assert a cause of action in an amended complaint does not relate back to the original complaint.[6] The Court further holds that standing to bring a claim asserted for the first time in an amended complaint must be judged as of the amended complaint.[7] This is consistent with the basic principle that "a plaintiff must demonstrate standing for each claim he seeks to press." *DaimlerChrysler*, 547 U.S. at 352.

In that light, the analysis of Claim 3 is no different than if Plaintiff had first sued

---

[6] Even if relation back could apply, it is unclear it would help Plaintiff. Claim 3 could not have been brought any earlier than September 26, 2019, when the categorical exclusion was finalized. (ECF No. 34-2 at 5.) *See also* 5 U.S.C. § 704 (APA applies to "final agency action"). Plaintiff filed suit on September 6, 2019, when no one (yet) had standing to challenge the categorical exclusion.

[7] Or, perhaps, as of the date the plaintiff moved to amend—but that is not at issue here. (*See* n.5, above.)

on October 23, 2019. Defendant completed its work under the Cooperative Service Agreement on October 22, 2019. (ECF No. 32.) Defendant submitted declarations from its state director and from the responsible Commerce City official that Defendant's work under the Cooperative Service Agreement was entirely finished as of that date. (ECF No. 44-1 ¶ 5; ECF No. 44-2 ¶ 5.)[8]  Thus, as of October 23, 2019, when Plaintiff filed the Second Amended Complaint, there was no order the Court could issue to redress Plaintiff's NEPA injury. As previously explained, the theory of NEPA redressability is that if an agency inadequately examined the environmental consequences of its proposed action, then ordering it to look at the issue more thoroughly might prompt the agency to change its mind. There was no order the Court could issue on October 23, 2019, that could have had that effect. Defendant had already killed all of the prairie dogs it was planning to kill.

For these reasons, Plaintiff did not have standing on the date it filed the Second Amended Complaint to assert Claim 3. The Court must dismiss Claim 3 for lack of subject matter jurisdiction.

## IV. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1. The Court's September 30, 2019 Order to Show Cause (ECF No. 25 at 13) is MADE ABSOLUTE;

2. The Court's October 23, 2019 Order to Show Cause (ECF No. 37) is MADE ABSOLUTE;

---

[8] To the extent this could have been a disputed factual issue, subsequent proceedings have borne out Defendant's position: Defendant never returned, and Commerce City arranged for follow-up extermination through a private contractor.

3. Defendant's Motion to Dismiss the Second Amended Complaint Under Rule 12(b)(1) and Rule 12(b)(6) (ECF No. 49) is GRANTED and Plaintiff's claims are accordingly DISMISSED WITHOUT PREJUDICE for lack of subject matter jurisdiction;

4. Plaintiff's Motion to Complete the Administrative Record (ECF No. 71) is DENIED AS MOOT;

5. The Clerk shall enter judgment in favor of Defendant and against Plaintiff, and shall terminate this case; and

6. To the extent a federal agency may recover its costs in a suit such as this, Defendant shall have its costs upon compliance with D.C.COLO.LCivR 54.1.

Dated this 25th day of June, 2020.

BY THE COURT:

_____
William J. Martinez
United States District Judge